```
                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF OHIO
                            EASTERN DIVISION


James E. Wolford,              :

       Plaintiff,              :

    v.                         :    Case No.  2:15-cv-2710

                               :    JUDGE MICHAEL H. WATSON
Commissioner of Social Security,    Magistrate Judge Kemp

       Defendant.              :
```

                      REPORT AND RECOMMENDATION

                         I.   Introduction

     Plaintiff, James E. Wolford, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for social security disability benefits and supplemental security income.  Those applications were filed on May 16, 2011 and May 31, 2011, respectively, and alleged that Plaintiff became disabled on August 1, 2007.

     After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on August 14, 2013.  In a decision dated December 9, 2013, the ALJ issued a decision denying benefits.  That became the Commissioner's final decision on March 8, 2015, when the Appeals Council denied review.

     After Plaintiff filed this case, the Commissioner filed the administrative record on November 13, 2015. Plaintiff filed his statement of specific errors on February 23, 2016, to which the Commissioner responded on April 19, 2016.  No reply has been filed, and the case is now ready to decide.

     II.  The Lay Testimony at the Administrative Hearing

     Plaintiff, who was 35 years old at the time of the administrative hearing and who started, but did not complete, the

tenth grade, testified as follows.  His testimony appears at pages 41-52 of the administrative record.

Plaintiff first testified that he last worked at a factory where he ran a saw in a pallet operation.  He left that job due to an injury.  Before that, he worked at Bellisio Foods, a job involving pushing racks back and forth to a cooler.  He had no trouble doing that job, but he left because he felt uncomfortable being around people.

When asked why he could not work, Plaintiff said that he has headaches on a daily basis, the left side of his face is numb, he cannot sleep at night, and his bones ache.  Those problems, and problems with people, would prevent him from doing his past work.

Plaintiff also testified that he was in special education classes in school for reading and math.  He had difficulty reading and writing as well as some comprehension problems.  He experienced an injury to the left side of his face in an ATV accident and could not see at all out of his left eye.  That accident also affected his memory and caused his headaches.  He left his home only go to the store or to the doctor.  He did not do any household chores, relying on his mother to do that.

### III.  The Medical Records

The medical records in this case are found beginning on page 313 of the administrative record.  The pertinent records - those relating to Plaintiff's mental impairment - can be summarized as follows.

At the request of his mother, Plaintiff was tested in 1995, when he was 16.  She reported that he continued to struggle in school and was demonstrating social difficulties as well.  Plaintiff was oriented as to person but confused about place and not oriented as to time.  All of his IQ sub-test scores were 66 or below and his composite score was 52.  He also showed a significant level of maladaptive behavior.  The examiner

concluded that Plaintiff was functioning in the moderate range of mental retardation and that he had difficulty with communication and activities of daily living.  It was also noted that his "socialization skills appear to be well below even his other adaptive behavior skills."  He was diagnosed with atypical autism, major depression, and mental retardation, and the recommendation was made to place him in a school for the mentally retarded.  (Tr. 313-18).  A caseworker subsequently completed a form in 1996 indicating that Plaintiff had "pervasive developmental delay" and that it was likely to be a life-long condition.  She concluded that he was markedly or extremely limited in several areas of work-related functioning and moderately limited in several others.  (Tr. 319-21).

   The next time Plaintiff was evaluated was 2008, when he was 29.  Dr. White, a psychologist, performed that evaluation in connection with a prior application for benefits.  Plaintiff told Dr. White that he had learning disabilities, had been arrested several times for drunk driving, and had health problems.  He socialized with his mother frequently, his brother infrequently, and with friends when they brought him beer.  He maintained fair eye contact during the interview and displayed pain behavior.  His affect was blunted.  He reported that he watched television, smoked, and drank beer during the day.  He had problems sleeping.  His effort on testing was not optimal, but he obtained a full-scale IQ score of 58, which fell within the mild mental retardation range.  Dr. White felt those scores were invalid and that Plaintiff was actually functioning with the low borderline range of ability.  He found only mild impairments in some areas of work-related functioning, and none in the area of understanding, remembering, and following instructions.  (Tr. 323-28).

   Plaintiff also underwent an evaluation in connection with

his present applications. That evaluation was done on December 20, 2011, by Dr. McKinney. Plaintiff reported constant anxiety and depression and said that he had no friends and rarely left his residence. He appeared both anxious and depressed but he was alert and oriented. He could not complete simple arithmetic problems, and his general level of intelligence fell in the borderline range. Dr. McKinney did not administer an IQ test. She did diagnose borderline intellectual functioning as well as other disorders and rated his GAF at 49. She concluded that he could follow simple instructions, that his attention might deteriorate over extended time periods, that he would have difficulty holding adult-level conversations in the workplace, and that he might need excessive support to adjust to new tasks or changes in a competitive work environment. (Tr. 434-40).

    In connection with the initial denial of Plaintiff's applications, Dr. Haskins, a psychologist, determined that there was insufficient evidence to evaluate Plaintiff's claim of psychological disability, apparently due to Plaintiff's failure to respond, at that time, to a request that he undergo a consultative psychological evaluation. On reconsideration, Dr. Lewin evaluated Plaintiff's condition under several sections of the Listing of Impairments (although not Section 12.05(C)) and found he did not meet any of them. She also concluded that he had a moderate impairment in his ability to understand and remember detailed instructions and to maintain attention and concentration for extended periods as well as to complete a workday and work week without interruption from psychologically-based symptoms. He also had issues dealing with changes in the work setting but he could work in an environment where changes were infrequent and thoroughly explained. (Tr. 106-08). It does not appear that either Dr. Haskins or Dr. Lewin considered the results of the testing from 1995.

IV.     The Vocational Testimony

Deborah Dutton-Lambert was called to testify as a vocational expert. Her testimony begins at page 52 of the administrative record.

Ms. Dutton-Lambert had previously characterized Plaintiff's past work, indicating that he had been a material handler, farm laborer, and store laborer, jobs which ranged from medium to heavy in exertional level and which were unskilled or semi-skilled. She added the job of saw mill laborer based on his testimony, stating that it was an unskilled medium position.

Ms. Dutton-Lambert was then given a hypothetical question which asked her to identify any jobs which could be done by someone who was limited to medium work and who could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. The person could occasionally balance, stoop, kneel, crouch, and crawl. The person also could only do jobs where fine vision was not required, where there was no reading of small print, and where good depth perception was not required. From a psychological standpoint, the person was limited to performing simple, repetitive tasks in an environment without strict production goals or demands, and where changes were infrequent and would be thoroughly explained. The person also could interact with others only occasionally and superficially. Ms. Dutton-Lambert responded that such a person could work as a vehicle cleaner, dish washer, or industrial cleaner, all of which were medium jobs. Such a person could also do a number of light jobs such as housekeeper/cleaner, continuous towel roller, and street cleaner.

Next, Ms. Dutton-Lambert was asked if someone who would miss two or more days of work per month could do those jobs; she said that such an absenteeism rate was not acceptable during a probationary period and jeopardized employment thereafter. She

-5-

also testified that being off task 15% of the time was the threshold for employment and being off task 20% of the time was work-preclusive.

## V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 15-30 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2012. Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 1, 2007. Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including status post left knee ACL repair with residual mild arthritis, mild lumbar degenerative disc disease, left eye blindness status post traumatic head injury, headaches, an affective disorder, an anxiety disorder, borderline intellectual functioning, and an alcohol abuse disorder. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform light work except that he could occasionally climb ramps and stairs and occasionally balance, stoop, kneel, crawl, and crouch and could never climb ladders, ropes or scaffolds. He could also only do jobs where fine vision or reading of small fonts was not required. Lastly, Plaintiff could perform simple, repetitive tasks in an environment without strict production goals or demands and where changes were infrequent and would be thoroughly explained and he could interact with others only occasionally and superficially. With these restrictions, the ALJ

concluded that Plaintiff could not perform his past relevant work, but that he could perform the three light jobs identified by the vocational expert.  Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

      VI.  <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, Plaintiff raises a single issue: that the ALJ improperly failed to find that Plaintiff satisfied the criteria for disability set out in Section 12.05(C) of the Listing of Impairments.  This issue is evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is

supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

In order for a claimant to qualify for disability under section 12.05(C) of the Listing of Impairments, the claimant must meet both the criteria for mental retardation and have another impairment which significantly limits his or her ability to perform work-related functions.  Section 12.05 sets forth certain qualifying scores on IQ tests which must be achieved in order to demonstrate mental retardation.  For subsection (C), it is a valid verbal, performance, or full-scale IQ score between 60 and 70. However, such a score is not sufficient to prove the existence of mental retardation. According to the preamble to that Section, the claimant must also demonstrate deficits in adaptive functioning which manifested themselves prior to age 22. If that evidence is absent, the Listing has not been satisfied. See Brown v. Secretary of H.H.S., 948 F.2d 268 (6th Cir. 1991).

In discussing the Listing of Impairments, the ALJ specifically considered Section 12.05(C).  He said the following things pertinent to that inquiry: "there is no evidence of significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period"; "there is no evidence of an intellectual efficiency examination"; "the claimant's accuracy in language arts and reading both appeared in the average range"; "the claimant has demonstrated an ability to maintain work activity, including work at a semi-skilled level" and "reported past work as a heavy equipment operator, which certainly appears inconsistent with the alleged level of intellectual defect"; "the claimant has also displayed an ability to live independently and he was married and divorced"; and, finally, "the claimant has a driver's license maintains normal personal hygiene, attends to household chores, and gets along well with others."  (Tr. 19).

The ALJ cited to various parts of the record as support for these statements. He also observed that the although the earlier IQ scores were indicative of mild mental retardation, the more recent scores "provide little substantive value." It can be gleaned from this discussion that the ALJ found that Plaintiff did have qualifying IQ scores and at least one other severe impairment, and that the denial of benefits under Section 12.05(C) occurred because of the lack of proof of deficits in adaptive functioning. Plaintiff asserts, in his statement of error, that the record does not support the factual findings made by the ALJ.

Taking the first two statements together, it is not clear what the ALJ's statement about an "intellectual efficiency examination" means or how that is significant. As to deficits in adaptive functioning prior to age 22, the educational records which the ALJ cited (Exhibit 1E) show that when Plaintiff was in third grade he was still at a first grade level in every discipline and that he was placed in special education classes for 2½ hours per day. The testing done eight years later showed that he was in the second percentile or below in verbal reasoning, abstract/visual reasoning, quantitative reasoning, and short-term memory. His best score showed him functioning at age level seven although he was sixteen or seventeen at the time. The examiner also commented that Plaintiff's daily living skills were comparable to that of a three-year-old and his socialization skills were not even at that level. The next document in the record after that evaluation contains a statement that Plaintiff had pervasive developmental delay. Given this evidence, it is difficult to see how the ALJ concluded that the record contained no evidence of deficits in adaptive functioning during the developmental period. That statement is not supported by substantial evidence. The documents cited by the ALJ also do not support the observation that Plaintiff's accuracy in language

arts and reading were both in the average range; the 2008 evaluation notes only that Plaintiff reported maintaining passing grades in his classes through the tenth grade, but clearly states that he was in special education classes throughout. (Tr. 324). The ALJ appears to have either misinterpreted or mischaracterized the record when he concluded that Plaintiff had average abilities in these areas.

As to Plaintiff's work activity, Plaintiff correctly points out that the record reflects that he held four jobs. Three are listed on Exhibit 15E, and they are classified as either SVP 2 or SVP 3. None is described as "heavy equipment operator." SVP, which stands for "Specific Vocational Preparation," is a number used to indicate the skill level need to perform a particular job. A job with an SVP level of one or two is unskilled; a job with an SVP of three is considered semi-skilled. The fourth, the sawmill job Plaintiff testified about at the hearing, was classified by the vocational expert as SVP 2, so it was unskilled. Consequently, the only semi-skilled job identified in the record was that of "material handler." When the form completed by the vocational expert is compared to the form completed by Plaintiff explaining his past jobs (Ex. 5E), it appears that the material handler job consisted of putting items on a rack with wheels and wheeling the rack to another location. As Plaintiff performed it, it did not involve the use of tools or equipment or any technical knowledge or skill, and he did not do any writing or reporting. (Tr. 264). Thus, there is no evidence in the record that Plaintiff actually performed a semi-skilled job. There is a statement in Dr. White's report that Plaintiff's most recent job was as a heavy equipment operator, but the vocational expert did not identify any such job, nor did Plaintiff testify to one. It appears the last job he held before seeing Dr. White was the one where he ran a saw, but the VE said that was an unskilled job, and Plaintiff said that he simply

pushed boards through a saw, did the job on less than a full-time basis for about a month, and was often told he was not doing it correctly. (Tr. 42-43). Consequently, it is also not reasonable to infer from this record that Plaintiff actually operated heavy equipment in a manner that undercut his claim that Section 12.05(C) applies here.

As to Plaintiff's ability to live independently, he correctly points out in his statement of errors that the adult function report (completed by Plaintiff's mother) showed that he lived in a trailer next to his mother's home, needed help matching his clothes, could not remember what he washed when he bathed, and had to be told how much shampoo to use for his hair. He needed help to remember when to take his medicine and what to take, and when he cooked he would forget to turn the stove off. He did almost no household chores and did not go shopping, could not manage money, and was anti-social. (Tr. 255-62). His only marriage ended in divorce. The ALJ neither mentioned nor discussed the bulk of this evidence, citing only to Dr. White's consultative examination report from 2008 as evidence supporting his conclusions. Even that report said, contrary to the ALJ's finding that Plaintiff "gets along well with others," that Plaintiff "has current problems with people in the community including his neighbors, store clerks, and public officials." (Tr. 324). The references to his heating up canned food, using paper plates, watching television, sitting on his porch, smoking cigarettes, and drinking beer do not indicate a wide range of functioning. (Tr. 327).

In short, the ALJ made a number of statements which are not supported either by anything in the record or a fair reading of it, and he disregarded other pertinent evidence in reaching his conclusion that there is no evidence here of deficits in adaptive functioning prior to age 22. That is a sufficient basis for ordering a remand for further consideration of the issue in light

of all of the evidence of record.  Cf. Beaver v. Colvin, 2014 WL 4804210 (N.D. Ind. Sept. 26, 2014)(remanding a case where the ALJ's discussion of the Listing issue was incorrect and did not provide a sufficient analysis for meaningful review).

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge